UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                                 :

RIVERKEEPER, INC.,                  :    Case No. _____
                                 :
                Plaintiff,          :    **COMPLAINT FOR**
                                 :    **DECLARATORY AND**
      v.                           :    **INJUNCTIVE RELIEF AND**
                                 :    **CIVIL PENALTIES**
GRECO BROS. CONCRETE OF L.I., INC.   :
                                 :    (Federal Water Pollution Control
             Defendant.       :    Act, 33 U.S.C. §§ 1251 to 1387)
                                 :
------------------------------------------------------------ X

       Plaintiff Riverkeeper, Inc. by and through its counsel, hereby alleges:

## I.

## INTRODUCTION

       1.      This is a civil suit brought under the citizen suit enforcement provisions of the

Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act," "the

Act," or "CWA") to address and abate Defendant's ongoing and continuous violations of the

Act.

       2.      Defendant discharges polluted stormwater runoff from its ready mix concrete

facility located at 381 Hamilton Avenue in Brooklyn (the "Facility"), into the Gowanus Canal

without authorization, in violation of Sections 301(a) and 402(p)(2)(B) of the CWA, 33 U.S.C.

§§ 1311(a) and 1342(p)(2)(B).  Defendant has failed to obtain coverage under and comply with

the conditions of an individual National Pollutant Discharge Elimination System ("NPDES")

permit or the State of New York, General Permit for the Discharge of Stormwater Associated

with Industrial Activity ("the General Permit") issued by the New York State Department of

Environmental Conservation ("DEC"), in violation of Sections 402(p)(3)(A) and (p)(4)(A) of the CWA, 33 U.S.C. §§ 1342(p)(3)(A) and (p)(4)(A), and 40 C.F.R. §§ 122.26(c)(1) and (e)(1).

3.      Stormwater runoff is one of the most significant sources of water pollution in the nation, comparable to, if not greater than, contamination from industrial and sewage sources. With every rainfall event, hundreds of millions of gallons of polluted rainwater pour into the New York Harbor, Long Island Sound, and other receiving waters in this District.  The State of New York has designated more than 6,676 river miles, 317,000 acres of larger waterbodies, 560 square miles of harbors, bays and estuaries, 778 acres of wetland, and 592 miles of Great Lakes shoreline in the State as "impaired," or not meeting water quality standards, and unable to support beneficial uses such as fish habitat and water contact recreation.  In many of these waters, state water quality standards for metals, oil and grease, nutrient enrichment and oxygen depletion, inorganic pollutants, pathogens, taste, color, odor, and other parameters are consistently exceeded.  For the overwhelming majority of water bodies listed as impaired, stormwater runoff is cited as a primary source of the pollutants causing the impairment.

4.      Defendant's stormwater discharges contribute to this endemic stormwater pollution problem.  Defendant engages in industrial activities that include the purchase, collection, processing, and outdoor storage of sand, aggregate, Portland cement, and other substances used in manufacturing, loading, and delivering ready mix concrete.  The Facility also houses a fleet of trucks, a ready mix concrete plant, truck washing equipment, and piles of raw material.  All of these are potential sources of industrial pollutants. Defendant mixes raw materials into concrete on site, transfers the concrete to trucks, and washes out trucks at the facility.  As precipitation comes into contact with pollutants generated by these industrial activities, it conveys those pollutants to the Gowanus Canal.  Contaminated stormwater

discharges such as those from the Facility can and must be controlled to the fullest extent required by law in order to allow the Gowanus Canal a fighting chance to regain its health.

## II.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over the parties and this action pursuant to Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1) and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

6.      Riverkeeper has complied with the notice requirements under Section 505(b)(1) of the CWA, 33 U.S.C. § 1365(b)(1).

7.      On April 15, 2013, Riverkeeper provided notice of Defendant's violations of the Act and of its intention to file suit to Defendant; the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region II; and the Commissioner of DEC, as required by the Act, 33 U.S.C. § 1365(b)(1)(A), and the corresponding regulations at 40 C.F.R. §§ 135.1 to 135.3.  A true and correct copy of Riverkeeper' notice letter is attached as Exhibit A, and is incorporated by reference.

8.      More than sixty days have passed since the notice letter was served on Defendant and the state and federal agencies.

9.      Neither the EPA nor the State of New York has commenced or is diligently prosecuting a civil or criminal action to redress the violations alleged in this complaint.  *See* CWA § 505(b)(1)(B), 33 U.S.C. § 1365(b)(1)(B).

10.     This action is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

3

11.     Venue is proper in the Eastern District of New York pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), and 28 U.S.C. § 1391(b)(2) because the source of the violations complained of is located, and the acts and omissions giving rise to the claims occurred, within this judicial district.

### III.

### PARTIES

12.     Plaintiff Riverkeeper, Inc. is a not-for-profit environmental organization organized under the laws of the state of New York, with its principal place of business in Ossining, New York.  Riverkeeper's mission includes safeguarding the ecological and biological integrity of the Hudson River and its tributaries.  Riverkeeper was originally founded by the Hudson River Fisherman's Association, a group of fishermen concerned about the ecological state of the Hudson River, and the effect of its polluted and degraded condition on fish. Riverkeeper achieves its mission through public education, advocacy for sound public policies and participation in legal and administrative forums.  Riverkeeper has more than 3,250 members, many of whom reside near to, use and enjoy the Hudson River and the waters and tributaries of New York Harbor, including more than one hundred members that live in close proximity to the Gowanus Canal, which is polluted by industrial stormwater runoff from the Defendant's ready mix concrete plant.

13.     Riverkeeper's members use and enjoy the waters which Defendant has unlawfully polluted and is unlawfully polluting.  Many of Riverkeeper's members live near the Gowanus Canal, participate in community activities focused around the Gowanus Canal, and recreate upon and alongside the waters of New York Harbor, including the Gowanus Canal.  Water quality in the Gowanus Canal (and by extension, in New York Harbor) directly affects the health,

4

recreational, aesthetic, commercial, and environmental interests of Riverkeeper's members.  The interests of Riverkeeper's members are being, and will be, adversely affected by defendants' failure to comply with the requirements of the Clean Water Act.

14.     The relief sought herein will redress the harms to Riverkeeper and its members caused by Defendant's activities.  Continuing commission of the acts and omissions alleged herein will irreparably harm Riverkeeper and its members, for which harm they have no plain, speedy or adequate remedy at law.

15.     Riverkeeper is informed and believes, and thereupon alleges, that Defendant Greco Bros. Concrete of L.I., Inc. ("Greco") is a corporation incorporated under the laws of the State of New York, which owns and operates a ready mix concrete plant at 381 Hamilton Avenue.

## IV.

## STATUTORY AND REGULATORY BACKGROUND

### The Clean Water Act

16.     Congress enacted the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  CWA Section 101(a), 33 U.S.C. § 1251(a).  In furtherance of this goal, the Act provides a comprehensive approach for the regulation of pollution discharged into the waters of the United States.

17.     The CWA prohibits the discharge of pollutants from a "point source" into the waters of the United States without a NPDES permit.  A NPDES permit requires dischargers of pollution to comply with various limitations.

18.     NPDES permits are issued by EPA or by States that have been authorized by EPA to act as NPDES permitting authorities, provided that the state permitting program ensures

compliance with the procedural and substantive requirements of the CWA. *See* 33 U.S.C. § 1342(b)(1); 40 C.F.R. § 123.25(a).

19.    In New York, DEC has been delegated the authority to issue NPDES permits.

### Stormwater Permits

20.    In 1987, to better regulate pollution conveyed by stormwater runoff, Congress enacted Clean Water Act Section 402(p), 33 U.S.C. § 1342(p), entitled "Municipal and Industrial Stormwater Discharges."

21.    Section 402(p) establishes a framework for regulating municipal and industrial stormwater discharges under the NPDES program. 33 U.S.C. § 1342(p). Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, EPA promulgated stormwater discharge regulations at 40 C.F.R. § 122.26.

22.    In promulgating those regulations, EPA cited abundant data showing the harmful effects of stormwater runoff on rivers, streams and coastal areas across the nation. In particular, EPA found that runoff from industrial facilities contained elevated pollution levels and that, on an annual basis, pollutant levels in stormwater runoff can exceed by an order of magnitude the levels discharged by municipal sewage treatment plants. 55 Fed. Reg. 47990, 47991 (Nov. 16, 1990).

23.    Sections 402(p)(2)(B) and 402(p)(3)(A) and 402(p)(4)(A) of the Act, 33 U.S.C. § 1342(p)(2)(B), (p)(3)(A) and (p)(4)(A), and the stormwater discharge regulations at 40 C.F.R. § 122.26 require NPDES permits for stormwater discharges "associated with industrial activity."

24.    40 C.F.R. § 122.26(c)(1) provides that dischargers of stormwater associated with industrial activity must apply for an individual permit, apply for a permit through a group application, or seek coverage under a general permit.

25.    40 C.F.R, § 122.26(b)(13) defines "storm water" to include stormwater runoff, snow

melt runoff, and surface runoff and drainage.

26.     40 C.F.R. § 122.26(b)(14) specifies that "storm water discharge associated with industrial activity" includes stormwater discharge from facilities classified under Standard Industrial Classification ("SIC") code 3273 (ready mixed concrete).  Facilities in this industrial category must obtain NPDES permit coverage for their stormwater discharges.

### New York's General Permit for the Discharge of Stormwater Associated with Industrial Activity

27.     As a delegated state NPDES permitting agency, DEC has elected to issue a statewide general permit for industrial stormwater discharges in New York.  The current version of the "Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity," Permit No. GP-0-12-001 (the "General Permit") came into effect on October 1, 2012 and remains in effect.

28.     In order to discharge polluted stormwater lawfully in New York, industrial dischargers must obtain coverage under the General Permit and comply with its terms, or obtain coverage under and comply with an individual NPDES permit.

29.     To obtain coverage under the General Permit, a facility discharging stormwater associated with industrial activity is required to submit to DEC a registration form called a "Notice of Intent" to be covered under the General Permit.

30.     In order to comply with the General Permit, a facility owner or operator must reduce the discharge of pollution from the facility to the extent practicable through use of the best available technology for the industry.

31.     The owner or operator also must comply with numeric effluent limitations on the quantity and concentration of pollutants discharged from the facility established in the General Permit, as well as narrative ("non-numeric") effluent limits established in the General Permit.

7

32.     Typically, facility owners and operators reduce pollution to the extent practicable through use of the best available technology for the industry, and comply with effluent limitations, by adopting "best management practices" that reduce the discharge of polluted stormwater.  Best management practices include both changes to industrial practices and activities (for example, more frequent inspections and site clean ups) and structural changes to the property that prevent stormwater from coming into contact with pollutants in the first place and that otherwise reduce the amount of polluted stormwater eventually discharged from the facility.

33.     Before submitting a registration form to DEC, the owner or operator of a facility discharging stormwater associated with industrial activity must first prepare, make available, and implement a Storm Water Pollution Prevention Plan ("SWPPP").  Among other things, the SWPPP must document the best management practices that the facility has implemented to ensure that it is reducing the discharge of pollution from the facility to the extent practicable through use of the best available technology for the industry.

34.     In addition, the owner or operator must perform inspections, conduct monitoring and sampling, and meet other requirements of the General Permit.  The SWPPP must establish a plan for and document compliance with these inspection, monitoring, sampling, and other requirements as well.

**CWA Citizen Enforcement Suits**

35.     Under CWA Section 505(a)(1), any citizen may commence a civil action in federal court on his own behalf against any person who is alleged to be in violation of an "effluent standard or limitation" under the CWA.  33 U.S.C. § 1365(a)(1).

36.     Such enforcement action under CWA Section 505(a), 33 U.S.C. § 1365(a),

8

includes an action seeking remedies for an unpermitted discharge in violation of Section 301 of the CWA, 33 U.S.C § 1311, as well as for violation of a condition of a permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.  *See* CWA Section 505(f), 33 U.S.C. § 1365(f).

37.     Declaratory relief in such cases is authorized by 28 U.S.C. § 2201–02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration).

38.     Injunctive relief is authorized by Section 505(a) of the Act, 33 U.S.C. § 1365(a).

39.     Violators of the Act are also subject to an assessment of civil penalties of up to $32,500 per day per violation (for violations occurring between March 15, 2004 and January 12, 2009), and up to $37,500 per day per violation (for violation occurring after January 12, 2009). *See* 33 U.S.C. §§ 1319(d) and 1365(a) and 40 C.F.R. §§ 19.1–19.4.

## V.

## STATEMENT OF FACTS

### Defendant Controls Industrial Activities at the Facility

40.     On information and belief, the Defendant currently controls industrial operations on the 381 Hamilton Avenue property.

41.     On information and belief, the Defendant has controlled industrial operations on the 381 Hamilton Avenue property, directly or through a related entity, since at least 1974.

42.     Because the Defendant controls the industrial activities that take place at the Facility, the Defendant is responsible for managing stormwater at the Facility associated with those activities in compliance with the Clean Water Act.

43.     The Defendant is the person, as defined by 33 U.S.C. § 1362(5), responsible for the violations alleged in this Complaint.

9

**Defendant's Industrial Activities Expose Pollutants to Stormwater**

44.     The activities and practices of Defendant at the Facility expose materials and pollutants to stormwater.

45.     The Facility houses a fleet of trucks, a ready mix concrete plant, truck washing equipment, and materials piles.

46.     The equipment, vehicles and materials at the Facility are all potential sources of industrial pollutants, including aggregate, sand, Portland cement, cement additives, and minerals and waste materials reused in concrete manufacture such as shale, clay, limestone, slate, slag, pumice, fly ash, and baghouse settled dust.

47.     If specialty concretes or cast/formed products are demanded by a customer, the Facility may also house form release agents, latex sealants, and bitumastic coatings.

48.     Machinery on the site also can release into the environment fuel, oil, lubricants, PCBs, polycyclic aromatic hydrocarbons (PAHs), an array of metals, pH-affecting substances and chemical residues.

49.     On information and belief, active vehicles at the Facility also release pollutants to the environment, including gasoline, diesel fuel, anti-freeze, and hydraulic fluids.

50.     Further, vehicles at the Facility track dust, particulate matter, and other contaminants to areas on and off the premises from which these pollutants can enter stormwater and, ultimately, waters of the United States.

51.     Because Defendant fails to adequately shelter and otherwise contain these materials to prevent their release to the environment, precipitation falls on and flows over exposed materials, fluids, and particulates. Stormwater picks up wastes including but not limited to lead, iron, zinc, oil and grease, materials that generate Chemical Oxygen Demand, and pH

altering pollutants.

52.    A number of these pollutants can suspend or dissolve in stormwater.

**Defendant Discharges Stormwater From the Facility to Waters of the United States**

53.    With every rain storm or snow melt, polluted stormwater discharges from the Facility.  Stormwater containing the pollutants described above is conveyed off-site into waters of the United States both directly overland and by infiltration of pollutants into and through shallow groundwater that is immediately hydrologically connected to the Gowanus Canal.

54.    The Facility is located directly alongside the Gowanus Canal.

55.    Sand, aggregate (gravel) and other materials sit exposed to rain in large piles at the Facility, towards its southern and eastern end, next to the Gowanus Canal.

56.    The piles of material, trucks, and mixing areas are separated from the Gowanus Canal by a wall of concrete blocks that are spaced slightly apart and are not mortared together, leaving gaps between the blocks through which water flows. At times, the piles of aggregate and other materials are piled up against the concrete blocks and tower above them.

57.    When it rains, stormwater carries sand, aggregate and a mix of pollutants across portions of the site towards the canal, where the polluted stormwater is channeled through gaps in the concrete blocks and then into the water below.

58.    On information and belief, Defendant has begun, but has not yet completed, construction of a continuous concrete wall along the canal.

59.    Additionally, some piles of sand and aggregate are deposited on the canalward side of the concrete blocks that line the water's edge.  On information and belief, when sand and aggregate are deposited on the wrong side of this concrete wall, some of the sand and aggregate are deposited directly into the Gowanus Canal.  Additionally, material deposited on the wrong

side of the concrete wall, on the ledge above the Canal, flows directly into the canal when it rains.

60.      Vehicles also track sediment and other pollutants off-site and into the public way. Storm sewers carry this pollution into the Gowanus Canal as well.

61.      In addition to these surface flows of polluted stormwater into the Gowanus Canal, there is also a point source discharge of polluted stormwater into shallow groundwater that is directly hydrologically connected to the Gowanus Canal.

62.      On information and belief, the Facility is only partly paved and impervious.  On parts of the Facility's surface area, water can and does penetrate the surface.

63.      The Facility's concrete wall, buildings, vehicles and raw materials piles trap and channel polluted stormwater to low, unpaved points where the polluted stormwater infiltrates and drains away.

64.      Stormwater that infiltrates into the ground at the Facility in this manner is infiltrating directly through a few feet of soil and groundwater that is directly hydrologically connected to the Gowanus Canal.

65.      In addition, there is a pipe extending from the bulkhead of Defendant's property directly into the Gowanus Canal.  Riverkeeper believes, and alleges, that this pipe conveys polluted groundwater into the Gowanus Canal.

66.      Thus, pollutants dissolved in infiltrated stormwater at the Facility migrate quickly to the Gowanus Canal.

67.      Pollutants entering the Gowanus Canal also flow into the larger New York Harbor.

68.      The Gowanus Canal is a "water of the United States," as defined in 40 C.F.R. §

12

122.2 and, therefore, a "navigable water" as defined in Section 502(7) of the CWA, 33 U.S.C. §

1362(7).

69.     The Gowanus Canal consistently fails to meet state water quality standards.

70.     DEC has designated the Gowanus Canal as an impaired water pursuant to Section

303(d) of the CWA, 33 U.S.C. § 1313(d),  for failure to meet minimum water quality standards

due to high oxygen demand (low levels of dissolved oxygen) and the presence of floatables

(debris) attributable in part to urban stormwater runoff.  *See* DEC, "Impaired/Delisted Waters

NOT Included on the 2012 Section 303(d) List Aug 2012," available at

http://www.dec.ny.gov/docs /water_pdf/303d notlisted12.pdf.

71.     On information and belief, stormwater discharges from Defendant's Facility

contribute to the ongoing impairment of the Gowanus Canal by releasing oxygen demanding

chemicals and other pollutants that contribute directly to the Gowanus Canal's impaired status.

**Defendant has not Obtained Permit Coverage for These Discharges**

72.     As of April 15, 2013, the Facility was not covered by an individual NPDES

permit.

73.     As of April 15, 2013, the Facility was not covered by the General Permit.

74.     As of April 15, 2013, Defendant had not filed a registration with DEC seeking

General Permit coverage for the Facility.

75.     As of April 15, 2013, Defendant had not complied with any provisions of the

General Permit.

76.     Accordingly, on April 15, 2013, Riverkeeper sent Defendant via certified mail the

notice of intent to sue described above and attached to this complaint.

77.     Riverkeeper also sent a copy of the notice of intent to DEC.  After receiving a

copy of the notice, DEC staff inspected Defendant's Facility for themselves on May 1, 2013.

78.     Based on their inspection, DEC concluded that the Defendant discharges polluted stormwater to waters of the United States and its activities require a permit under the Clean Water Act.

79.     On information and belief, as of the date of filing of this complaint, June 17, 2013, the Facility still lacks NPDES permit coverage.

80.     Defendant's violations of the CWA at the Facility are ongoing and continuous, are capable of repetition, and result from the same underlying and inadequately resolved causes.

## VI.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### Unlawful Discharge of Pollutants
### (Violations of 33 U.S.C. §§ 1311, 1342)

81.     Riverkeeper incorporates by reference all preceding paragraphs as if set forth herein.

82.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), provides that the "discharge of any pollutant" by any "person" is unlawful, unless the discharge complies with various enumerated sections of the CWA.  Among other things, Section 301(a) prohibits discharges not authorized by a valid NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

83.     Section 502(5) of the CWA, 33 U.S.C. § 1362(5), defines "person" to include "an individual, corporation, partnership [or] association."

84.     Section 502(12) of the CWA, 33 U.S.C. § 1362(12), defines "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source."

14

85.    Section 502(6) of the CWA, 33 U.S.C. § 1362(6), defines "pollutant" to include, among other things, industrial wastes, chemical wastes, biological materials, rocks, sand, and garbage discharged into water.

86.    Section 502(14) of the CWA, 33 U.S.C. § 1362(14), defines "point source" broadly to include "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."

87.    Section 502(7) of the CWA, 33 U.S.C. § 1362(7), defines "navigable waters" as "the waters of the United States, including the territorial seas."

88.    40 C.F.R. § 122.2 defines "waters of the United States" to include, among other things:  (i) all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide; (ii) all interstate waters; (iii) tributaries to such waters; (iv) wetlands adjacent to such waters or their tributaries; and (v) all other waters the use, degradation, or destruction of which would affect or could affect interstate or foreign commerce.

89.    Section 402(p) of the CWA, 33 U.S.C. § 1342(p) and the implementing regulation found at 40 C.F.R. § 122.26(a)(1)(i) require that facilities discharging stormwater associated with industrial activity obtain a NPDES permit.

90.    Defendant has discharged and continues to discharge stormwater associated with industrial activity that contains pollutants from point sources to waters of the United States without a NPDES permit.

91.    Each and every day on which Defendant discharges stormwater associated with

15

industrial activity without authorization under a NPDES permit is a separate and distinct violation of Section 301(a) and Section 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342.

92.     Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Riverkeeper, and its members, for which harm Riverkeeper has no plain, speedy, or adequate remedy at law.

93.     Wherefore, Riverkeeper prays for relief as hereinafter set forth.

## SECOND CAUSE OF ACTION

### Failure to Apply for NPDES Permit Coverage
### (Violations of 33 U.S.C. §§ 1311, 1342)

94.     Riverkeeper incorporates by reference all preceding paragraphs as if set forth herein.

95.     40 C.F.R. § 122.26(c)(1)  and 122.26(e)(1)  require dischargers of stormwater associated with industrial activity to apply for an individual permit or seek coverage under a promulgated stormwater general permit by October 1, 1992.

96.     Since at least 1992, Defendant has operated and continues to operate a facility that engages in ''industrial activity'' as that term is defined in 40 C.F.R. § 122.26(b)(14).

97.     Since that time, Defendant has routinely discharged polluted stormwater associated with industrial activity from the facility to waters of the United States.

98.     Therefore, since that time, Defendant has been obligated to apply for coverage under an individual or general NPDES permit.

99.     Once Defendant began discharging polluted stormwater associated with industrial activity to waters of the United States, each and every subsequent day on which Defendant has failed to apply for permit coverage constitutes a separate and distinct violation of Section 301(a) and Section 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342.

100.     Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Riverkeeper, and its members, for which harm Riverkeeper has no plain, speedy, or adequate remedy at law.

101.     Wherefore, Riverkeeper prays for relief as hereinafter set forth.

### THIRD CAUSE OF ACTION

**Failure to Implement Adequate Control
Measures and Best Management Practices
(Violations of 33 U.S.C. §§ 1311, 1342)**

102.     Riverkeeper incorporates by reference all preceding paragraphs as if set forth herein.

103.     The General Permit, in Parts I.B and VII, requires that Defendant implement mandatory general and sector-specific control measures called Best Management Practices ("BMPs") in order to minimize the discharge of pollutants from the Facility.

104.     The selected measures must reduce the discharge of pollution from the Facility to the extent practicable through use of the best available technology for the industry in order to comply with both numeric and narrative effluent limits contained in the permit.

105.     For example, the General Permit requires that Defendant minimize the exposure of pollutants to stormwater (*see* General Permit Part I.B.1.a.2.a) in the first place and, to the extent that pollutants are exposed to stormwater despite Defendant's best efforts, the Defendant must also minimize the ultimate discharge of those pollutants in stormwater from the facility. *See* General Permit Part I.B.1.a.2.f.

106.     In this context, to "minimize" means to "reduce and/or eliminate to the extent achievable using control measures (including best management practices) that are technologically available and economically practicable and achievable in light of best industry

17

practice." General Permit, Part I.B.1.

107.    To "minimize" the discharge of pollutants as required by the General Permit, the facility's BMPs must meet the Clean Water Act standards of Best Available Technology Economically Achievable ("BAT" or "BATEA"), Best Conventional Pollutant Control Technology ("BCT") and/or Best Practicable Control Technology Currently Available ("BPT"), depending upon the type of pollutant being discharged.

108.    Because the industrial activities carried out at the Facility are categorized in SIC Code 3273, Defendant must also implement the sector-specific control measures specified in Part VIII of the General Permit for Sector E.

109.    Riverkeeper is informed and believes, and thereupon alleges that, as of the filing date of this complaint, Defendant has not fully implemented the control measures or BMPs required by the General Permit.

110.    Defendant has failed, and continues to fail, to implement adequate control measures and BMPs at the Facility as required by the General Permit.

111.    Defendant's ongoing failure to implement adequate control measures and BMPs at the Facility as required by the General Permit is evidenced by, *inter alia*, Defendant's outdoor storage of raw materials, including aggregate, without appropriate best management practices and in close proximity to the Gowanus Canal; the incomplete concrete wall along the Canal; the continued exposure of significant quantities of materials to stormwater flows; and the failure to implement effective containment practices on other parts of the Facility.

112.    Each and every day on which Defendant fails to comply with the General Permit's control measure and BMP requirements is a separate and distinct violation of Section 301(a) and Section 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342.

113.    Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Riverkeeper, and its members, for which harm Riverkeeper has no plain, speedy, or adequate remedy at law.

114.    Wherefore, Riverkeeper prays for relief as hereinafter set forth.

## FOURTH CAUSE OF ACTION

### Failure to Develop and Implement an Adequate
### Storm Water Pollution Prevention Plan
### (Violations of 33 U.S.C. §§ 1311, 1342)

115.    Riverkeeper incorporates by reference all preceding paragraphs as if set forth herein.

116.    Part III of the General Permit requires industrial dischargers to develop, implement and maintain compliance with a Stormwater Pollution Prevention Plan ("SWPPP").

117.    As described in Part III.A of the General Permit, the SWPPP must identify potential sources of pollution that may affect the quality of stormwater discharges associated with industrial activity.

118.    Further, the SWPPP must describe and ensure the implementation of best management practices that minimize the discharge of pollutants in stormwater and that assure compliance with the other terms and conditions of the General Permit, including achievement of effluent limitations.

119.    The SWPPP must address, at a minimum: (1) each of the elements set forth in Part III.C of the General Permit; (2) each of the applicable sector-specific plan elements specified in Part VIII of the General Permit and, (3) as applicable, each of the additional special requirements listed in Part III.F of the General Permit for industrial activities that discharge through a municipal separate storm sewer or to impaired waterbodies, activities that take place at

19

facilities that report under the federal Emergency Planning and Community Right to Know Act, and facilities that use secondary containment measures. The SWPPP must include records and documentation of compliance with each of these elements and requirements.

120. The SWPPP must be representative of current site conditions and kept up to date.

121. The SWPPP must be signed in accordance with Part V.H of General Permit.

122. At an active facility, the SWPPP must be kept on-site at all times.

123. The SWPPP must be prepared and must provide for compliance with the terms of the General Permit on or before the date of submission of a Notice of Intent to be covered under the General Permit.

124. Because the industrial activities carried out at the Facility are categorized in SIC Code 3273, Defendant must include the sector-specific SWPPP elements specified in Part VIII of the General Permit for Sector E, in addition to the SWPPP elements set forth in Part III of the General Permit.

125. Under Part III.D.2 of the General Permit, the owner or operator of a facility "must make a copy of the SWPPP available to the public within 14 days of receipt of a written request."

126. Riverkeeper requested a copy of Defendant's SWPPP on April 15, 2013.

127. Defendant has not provided Riverkeeper with a copy of a SWPPP.

128. Riverkeeper alleges that, as of the filing date of this complaint, June 17, 2013, Defendant had not developed an adequate SWPPP.

129. Defendant has failed, and continues to fail, to develop, implement and maintain compliance with an adequate SWPPP for the Facility as required by the General Permit and to take the other SWPPP-related actions required by the General Permit and described herein.

130.     Defendant's ongoing failure to develop and implement an adequate SWPPP for the Facility and to take the other SWPPP-related actions required by the General Permit is also evidenced by, *inter alia*, Defendant's outdoor storage of raw materials, including aggregate, without appropriate best management practices and in close proximity to the Gowanus Canal; the incomplete concrete wall along the Canal; the continued exposure of significant quantities of materials to stormwater flows; and the failure to implement effective containment practices on other parts of the Facility.

131.     Each and every day on which Defendant fails to comply with the General Permit's SWPPP requirements is a separate and distinct violation of Section 301(a) and Section 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342.

132.     Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Riverkeeper, and its members, for which harm Riverkeeper has no plain, speedy, or adequate remedy at law.

133.     Wherefore, Riverkeeper prays for relief as hereinafter set forth.

### FIFTH CAUSE OF ACTION

**Failure to Conduct Routine Site Inspections and Comply With General
Monitoring, Recordkeeping, and Reporting Requirements
(Violations of 33 U.S.C. §§ 1311, 1342)**

134.     Riverkeeper incorporates by reference all preceding paragraphs as if set forth herein.

135.     The General Permit requires industrial dischargers to conduct and document comprehensive site inspections at appropriate intervals, but in no event less frequently than once a year.  The inspection must ensure that all stormwater discharges are adequately controlled and that all BMPs are functioning as expected.  *See* General Permit, Part IV.A.1.  Records of this

inspection must be kept for five years.  *See* General Permit, Part IV.A.2.

136.    In addition, qualified facility personnel must carry out routine inspections at least

quarterly.  *See* General Permit, Part III.C.7.b.2.  During these inspections, personnel must

evaluate conditions and maintenance needs of stormwater management devices, detect leaks and

ensure the good condition of containers, evaluate the performance of the existing stormwater

BMPs described in the SWPPP, and document any deficiencies in the implementation and/or

adequacy of the SWPPP.  *See* General Permit, Part III.C.7.b.1 and b.3.  Such deficiencies must

then be addressed through corrective actions.

137.    All covered facilities also must conduct multiple types of analytical monitoring as

described in Part IV.B of the General Permit and must keep records of their monitoring efforts in

accordance with Parts IV.B and IV.E of the General Permit.  The monitoring required under the

General Permit includes both various visual inspections and collection and laboratory analysis of

water quality samples.

138.    In addition, Defendant engages in industrial activities that fall within Sector E of

the General Permit's classifications of industrial activity, and therefore must also conduct

additional analysis of water quality samples for a range of pollutant parameters as set forth in

Part VIII of the General Permit.  *See* General Permit, Part VIII (requirements for Sector E).

These include:

a.  Total suspended solids

b.  Total Recoverable Iron; and

c.  pH.

139.    Riverkeeper is informed and believes, and thereupon alleges that, as of the filing

date of this complaint, Defendant had not conducted any of the site inspections, monitoring, and

testing required by Parts III, IV, and VIII of the General Permit. the General Permit.

140.     Defendant has failed, and continues to fail, to comply with the inspection,

monitoring, and testing requirements of the General Permit.

141.     Riverkeeper is informed and believes, and thereupon alleges that, as of the filing

date of this complaint, Defendant also has failed to retain records and submit monitoring reports

as required by Parts IV and VIII of the General Permit.

142.     Each and every day on which Defendant fails to comply with any of the General

Permit's inspection, monitoring, testing, recordkeeping and reporting requirements is a separate

and distinct violation of Section 301(a) and Section 402 of the CWA, 33 U.S.C. §§ 1311(a),

1342.

143.     Continuing commission of the acts and omissions alleged herein irreparably

harms the waters of the State, Riverkeeper, and its members, for which harm Riverkeeper has no

plain, speedy, or adequate remedy at law.

144.     Wherefore, Riverkeeper prays for relief as hereinafter set forth.

## SIXTH CAUSE OF ACTION

**Failure to Comply with Specific General Permit
Requirements Applicable to Ready Mix Concrete Plants
(Violations of 33 U.S.C. §§ 1311, 1342)**

145.     Riverkeeper incorporate by reference all preceding paragraphs as if set forth

herein.

146.     The General Permit contains various requirements specific to ready mix concrete

plants.  *See* General Permit, Part VIII (requirements for Sector E).  These include:

   a.   A requirement to include in the SWPPP and annual reports to DEC a description

        of measures that ensure that process wastewater that results from washing of

trucks, mixers, transport buckets, forms or other equipment are discharged in accordance with a separate SPDES permit or are recycled.

b.  A requirement to identify in the SWPPP the locations of any baghouse or other dust control device; and any recycle/sedimentation pond, clarifier or other device used for the treatment of process wastewater and the areas that drain to the treatment device.

c.  A requirement that site inspections take place while the Facility is in operation and shall include all of the following areas that are exposed to stormwater:

- Material handling areas

-  Aboveground storage tanks

- Hoppers or silos,

- Dust collection/containment systems

- Truck wash down/equipment cleaning areas

d.  A requirement to sweep the Facility weekly to prevent or minimize the discharge of cement and aggregate.

e.  A requirement to, if practicable, store cement and any other fine granular solids in enclosed silos or hoppers, buildings, or under other covering.

147.  Defendant has failed, and continues to fail, to comply with these requirements of the General Permit that apply to all ready mix concrete plants.

148.  Each and every day on which Defendant fails to comply with the General Permit's requirements applicable to ready mix concrete plants is a separate and distinct violation of Section 301(a) and Section 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342.

149.    Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Riverkeeper, and its members, for which harm Riverkeeper has no plain, speedy, or adequate remedy at law.

150.    Wherefore, Riverkeeper prays for relief as hereinafter set forth.

## VII.

## PRAYER FOR RELIEF

151.    Wherefore, Plaintiff Riverkeeper respectfully requests that this Court grant the following relief, as allowed by 33 U.S.C. § 1365(a) and 28 U.S.C. §§ 2201(a) and 2202:

(a)    Declare Defendant to have violated and to be in violation of the Act as alleged herein;

(b)    Enjoin Defendant from discharging pollutants from the Facility except as authorized by and in compliance with a NPDES permit;

(c)    Order Defendant to immediately apply for coverage under, and comply fully with all applicable requirements of, the General Permit (or an individual permit that is at least as stringent);

(d)    Order Defendant to take appropriate actions to remediate the harm caused by the violations of their NPDES permit and the CWA, to the extent possible;

(e)    Order Defendant to pay civil penalties of $32,500 per day per violation for all violations of the Act occurring between March 15, 2004 and January 12, 2009, and $37,500 per day per violation for all violations of the Act occurring after January 12, 2009, 2009 as provided by Sections 309(d) and 505(a) of the CWA, 33 U.S.C. §§ 1319(d) and 1365(a), and by 40 C.F.R. §§ 19.1 – 19.4;

(f)     Order Defendant to pay the costs of litigation, including Plaintiff's reasonable investigative costs, attorneys fees, witness, and consultant fees, and other costs, in accordance with Section 505(d) of the CWA, 33 U.S.C. § 1365(d); and

(g)     Award any such other and further relief as this Court may deem appropriate.


Dated this 17th day of June, 2013          Respectfully submitted,
New York, New York

                                           By:   /s/ Reed Super
                                                 Reed W. Super (RS-3615)
                                                 SUPER LAW GROUP, LLC
                                                 131 Varick Street, Suite 1033
                                                 New York, New York 10013
                                                 212-242-2355
                                                 855-242-7956
                                                 reed@superlawgroup.com
                                                 *Attorneys for Plaintiff Riverkeeper, Inc.*